UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

| | |
|---|---|
| AUDREY CARPENTER and ) <br> SANDRA RAMSEY, ) <br> ) <br> Plaintiffs, ) <br> ) <br> v. ) <br> ) <br> RENFRO VALLEY, LLC, ) <br> ) <br> Defendant. ) <br> ) | Civil No. 12-82-GFVT <br><br> **MEMORANDUM OPINION** <br> **&** <br> **ORDER** |

\*\*\*\*    \*\*\*\*    \*\*\*\*    \*\*\*\*

Renfro Valley is a destination for live music, dining, shopping, lodging, and entertainment in the heart of Central Kentucky. In July 2010, shortly after taking the helm as Renfro Valley's Chief Executive and Operating Officer, Vicki Kidd terminated employees Audrey Carpenter and Sandra Ramsey. Carpenter and Ramsey now sue Renfro Valley, alleging they were discriminated against on the basis of both their age and sex/gender in violation of the Kentucky Civil Rights Act. As neither plaintiff has presented a genuine issue for a jury to consider as to the question of pretext, summary judgment will be GRANTED in favor of Renfro Valley.

**I**

After Vicki Kidd was hired as Renfro Valley's Chief Executive and Operating Officer, her first task was to assess Renfro Valley's property, employees and entertainment. [R. 34-3 at 1; R. 35-6 at 17.] Carpenter recalls Kidd saying that "she had 90 days to make some changes," including "eliminat[ing] some things that would help save money" and also increasing accountability in the various departments, with the

ultimate aim of making Renfro valley more profitable and efficient. [R. 34-4 at 30, 35-36.] As Ramsey put it, Kidd was "trying to help Renfro Valley to make a profit because it was financially, you know, unstable." [R. 34-5 at 5.] During this period of evaluation, Kidd determined that Carpenter and Ramsey needed to be let go.

Audrey Carpenter worked in personnel and payroll between 2006 and the date of her termination. [R. 34-4 at 14.] Shortly after coming on board, Kidd actually promoted Carpenter to the post of Human Resources manager. [R. 34-4 at 17-18.] In this capacity, Carpenter's responsibilities remained generally the same but Carpenter was also tasked with preparing an employee handbook. [*Id*.] After spending some time at Renfro, Kidd "found fault" with Carpenters "work ethic and skill level in her accounting/human resources position." [R. 34-3 at 2-3.] Kidd also stated that the personnel files that Carpenter was responsible for keeping were "very poor and disorganized," Carpenter seemed unable to do payroll without the help of others, and that the personnel manual Carpenter had been tasked with preparing was not satisfactorily completed. [*Id*.] Finally, Kidd noted that Carpenter made mistakes in preparing tax documents that resulted in Renfro having problems with the IRS. [*Id*.] Ultimately, Kidd recommended to the owners of Renfro Valley that Carpenter be discharged. [*Id*.]

Sandra Ramsey worked at Renfro from 2003 to 2007, left, and then was rehired in August of 2007. [R. 34-5 at 16-18.] Ramsey was primarily responsible for marketing, graphic design and producing a newsletter, titled *The Bugle*. [R. 34-5 at 18-22.] Kidd similarly evaluated Ramsey, finding "fault with [her] work ethic," and noting that her work product was not of the "professional quality" that she expected. [R. 34-3 at 2.] Additionally, Kidd determined that *The Bugle* was "outdated, not cost-effective and

2

would be discontinued after the December 2010 issue." [*Id*.] "Based on [Kidd's] analysis of [Ramsey's] job performance, the fact that "The Bugle" was being discontinued, [Kidd's] mandate to make the company more efficient and profitable, and the needs and goals for the sales and marketing department in the future," Kidd recommended that Ramsey be discharged. [R. 34-3 at 2.]

On January 25, 2011, Kidd called Carpenter, Ramsey and Tammy Clontz, a contract employee and the supervisor of Carpenter and Ramsey, into her office and let them all know they were being terminated. [R. 34-4 at 37; R. 34-5 at 35.] At the time, Kidd's stated reason for terminating them was because Renfro Valley was "going in a different direction." [R. 34-4 at 38; R. 34-5 at 63.]

Kidd never issued a written reprimand to Carpenter, never performed a formal performance review or evaluation, never disciplined Carpenter, nor did she speak with her supervisor, Tammy Clontz, about her performance prior to her termination. [R. 35 at 5 (referring to R. 35-7 at 10-11; 18).] Similarly, Kidd did not meet with Ramsey nor did she discuss Ramsey's performance, position, or responsibilities with Clontz prior to Ramsey's termination. [R.35-6 at 6.]

On May 6, 2011, Plaintiffs filed a Complaint in Rockcastle Circuit Court, alleging discrimination due to both age and gender. [R. 1-2.] The case was subsequently removed to this Court. [R. 1.] Carpenter was fifty-three years old at the time of her termination [R. 1-2 at 3; R. 34-4 at 17] and Ramsey was fifty-one. [R. 1-2 at 3; R. 34-5 at 14.]

When initially asked why she was terminated, Carpenter responded, "I really don't know." [R. 34-4 at 44.] She did not know who decided to terminate her and had

3

heard nothing about the reason for it. [*Id*. at 45.] According to Carpenter, the man that replaced her, David Brummett, is probably about forty years old. [R. 34-4 at 47.] When Carpenter was asked more pointedly why she believes that her termination was due to age she said, "[b]ecause I've never been reprimanded before…" [R. 34-4 at 52.] When again asked why she believed she was terminated due to gender, she replied, "[t]his is just what I feel inside my heart. Ms. Kidd got along better with the male gender than she did the female gender." [R. 34-4 at 53.] In support of this perceived disparity, Carpenter notes that Kidd's tone and voice were different in staff meetings depending on whether Kidd was talking to men or women. [*Id*.]

When Ramsey was asked why she believed that she had been terminated, she also said, "I really don't know." [R. 34-5 at 45.] When pushed to provide more detail, she explained that she thought her termination was due to her age and gender because a younger man replaced her. [*Id*.]

## II

### A

Summary judgment is appropriate where "the pleadings, discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-25 (1986). "A genuine dispute exists on a material fact, and thus summary judgment is improper, if the evidence shows 'that a reasonable jury could return a verdict for the nonmoving party.' " *Olinger v. Corp. of the President of the Church*, 521 F. Supp. 2d 577, 582 (E.D. Ky. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

In deciding a motion for summary judgment, the Court must review the facts and draw all reasonable inferences in favor of the non-moving party. *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001) (*citing Liberty Lobby*, 477 U.S. at 255). The moving party has the initial burden of demonstrating the basis for its motion and identifying those parts of the record that establish the absence of a genuine issue of material fact. *Chao v. Hall Holding Co., Inc.*, 285 F.3d 415, 424 (6th Cir. 2002). The movant may satisfy its burden by showing "that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325. Once the movant has satisfied this burden, the non-moving party must go beyond the pleadings and come forward with specific facts to demonstrate there is a genuine issue. *Hall Holding*, 285 F.3d at 424 (*citing Celotex*, 477 U.S. at 324.) Moreover, "the nonmoving party must do more than show there is some metaphysical doubt as to the material fact. It must present significant probative evidence in support of its opposition to the motion for summary judgment." *Id*. (internal citations omitted).

The trial court is under no duty to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 655 (6th Cir. 2001) (*citing Street v. J.C. Bradford & Co*., 886 F.2d 1472, 1479-80 (6th Cir. 1989)). Instead, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *In re Morris*, 260 F.3d at 655.

**B**

The Plaintiffs allege that Renfro Valley violated the Kentucky Civil Rights Act, KRS § 344.450 which, among other things, prohibits employers from discharging

5

employees on the basis of either sex or age (40 years or older). Ky.Rev.Stat. Ann. § 344.040(1). Age discrimination claims brought under the Kentucky Civil Rights act are analyzed under the same framework used to analyze similar federal claims. *See Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393-94 (6th Cir. 2008) ("Claims brought under the KCRA are 'analyzed in the same manner' as ADEA claims.") (*citing Harker v. Fed. Land Bank of Louisville,* 679 S.W.2d 226, 229 (Ky. 1984)). "ADEA claims are in turn analyzed under the same framework as that employed under Title VII." *Rutherford v. Britthaven, Inc.*, 452 F. App'x 667, 670 (6th Cir. 2011) (*citing Grosjean v. First Energy Corp.,* 349 F.3d 332, 335 (6th Cir. 2003)). Similarly, because the Kentucky Civil Rights Act "mirrors Title VII of the Civil Rights Act of 1964, [gender] discrimination claims under the KCRA are to be evaluated using the federal standard of gender discrimination." *Bargo v. Goodwill Indus. of Kentucky, Inc.*, 969 F. Supp. 2d 819, 825 (E.D. Ky. 2013) (*citing Smith v. Leggett Wire Co.,* 220 F.3d 752, 758 (6th Cir. 2000)).

A plaintiff may prove both age and gender discrimination through the use of either direct or circumstantial evidence. *Geiger v. Tower Automotive,* 579 F.3d 614, 620 (6th Cir. 2009); *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 648-49 (6th Cir. 2012). "Direct evidence of discrimination is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Id.* (quoting *Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 570 (6th Cir. 2003)). Circumstantial evidence is "proof that does not on its face establish discriminatory animus, but does allow a fact finder to draw a reasonable inference that discrimination occurred." *Id.* In this case, the Plaintiffs produce no direct evidence of discrimination, so they bear the burden of proving a circumstantial case.

When a plaintiff seeks to prove intentional discrimination with circumstantial evidence, the burden shifting framework from *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) applies. *Geiger*, 579 F.3d at 621; *see also Blizzard v. Marion Technical Coll.,* 698 F.3d 275, 283 (6th Cir. 2012), cert. denied, 133 S. Ct. 2359 (2013). Under *McDonnell Douglas*, the plaintiffs must first establish a prime facie case of discrimination. *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010) (quoting *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 148 (2000)). If successful, the burden then shifts to the defendant employer to "articulate a legitimate nondiscriminatory reason for the adverse employment action." *Id*. at 264 (*citing Allen*, 545 F.3d at 394). Once this showing has been made, the burden of production shifts back to the plaintiff who must show that the employer's explanation was merely pretext for intentional discrimination. *Id*. (*citing Allen*, 545 F.3d at 394). Importantly, the burden of production shifts throughout the analysis, but the burden of persuasion remains on the plaintiff to "demonstrate that age [or gender] was the 'but-for' cause of their employer's adverse action." *Id*. (*citing Geiger*, 579 F.3d at 620; *Gross,* 557 U.S. at 623 n. 4) (internal quotations omitted).

### 1

For an individual to establish a prima facie case of age or sex discrimination they must demonstrate they were: (1) members of a protected class or, in the case of age discrimination, over the age of 40; (2) subjected to an adverse employment action; (3) qualified for the position they held; and (4) circumstances that support an inference of discrimination. *Blizzard*, 698 F.3d at 283; *Vincent v. Brewer Co.*, 514 F.3d 489, 494 (6th Cir. 2007); *Vickers v. Fairfield Med. Ctr.*, 453 F.3d 757, 769 (6th Cir. 2006). In the

context of age discrimination the fourth element requires a showing that the plaintiff was replaced by someone substantially younger. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

Defendants do not dispute that Plaintiffs present prima facie cases of age and gender discrimination, and the Court is satisfied that both Plaintiffs have made this showing. Briefly, as women, Carpenter and Ramsey are members of the protected class. *Vincent*, 514 F.3d at 494 (*citing Valentine–Johnson v. Roche,* 386 F.3d 800, 814 (6th Cir. 2004)). Carpenter was fifty-three years old [R. 1-2 at 3; R. 34-4 at 17] and Ramsey was fifty-one [R. 1-2 at 3; R. 34-5 at 14] at the time of their termination. Second, "[a]n employer's decision to discharge an employee is a classic example of an adverse employment action." *Id. (citing Kleiber v. Honda of Am. Mfg., Inc.,* 485 F.3d 862, 868 n. 2 (6th Cir. 2007)). Third, while Kidd has been critical of the Plaintiffs' work ethic and skill levels, the Defendants do not argue that they were not qualified for the positions. Furthermore, while there is considerable testimony from Kidd that their performance was sub-par, there was also no history of counseling them on their inadequacies. Finally, Carpenter was replaced by David Brummett who she believes is about forty years old. [R. 34-4 at 47] and Ramsey alleges that she was replaced by a man, Travis Gay, who she believes to be younger than her although she does not identify his age [R. 34-5 at 45].[1]

**2**

Since the Plaintiffs have presented prima facie cases of discrimination, the burden shifts to Renfro to articulate legitimate nondiscriminatory reasons for its adverse

---

[1] The Court notes that Jackie Morris, a female over the age of forty, was hired part-time, prior to Carpenter's termination, to assume some of Carpenter's work. [R. 34-4 at 17.] From the record, however, it appears that Brummett actually replaced Carpenter.

employment action. *See Allen,* 545 F.3d at 394 (*citing Ercegovich,* 154 F.3d at 350). At this stage, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Rather, Renfro's burden is one only of production. "[T]he ultimate burden of persuasion remains on the plaintiff to demonstrate that age [or sex] was the 'but-for' cause of their employer's adverse action." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 812 (6th Cir. 2011) (*citing Burdine,* 450 U.S. at 254).

At the time of their termination, Kidd explained to both Carpenter and Ramsey that Renfro was "going in a different direction" with the aim of making itself more profitable and efficient. Since that time, Kidd has provided more specific reasons for the terminations. With regard to Ramsey, Kidd explained that *The Bugle*, a publication that Ramsey was responsible for producing, was "outdated, not cost-effective and would be discontinued." [R. 34-3 at 2.] Ramsey was also responsible for producing other advertising materials, but Kidd explained that they were not of the quality that she expected. [*Id*.] The record is inconsistent on the question of whether Kidd found fault with Ms. Ramsey's work ethic, but it is quite clear that Kidd believed Ramsey to be incapable of producing the types of sales and marketing materials that she sought. [*Id*.; R. 35-7 at 48,72-73. ] Based on all the aforementioned reasons and also Kidd's goal of making the company more efficient and profitable, she recommended that Ramsey be discharged. [*Id*.]

Similarly, Kidd "found fault with Audrey Carpenter's work ethic and skill level in her accounting/human resources position." [*Id*. at 2-3.] According to Kidd, the files Carpenter kept were disorganized and she seemed unable to perform her job duties

9

without the assistance of others. [*Id*.]  Kidd also noted that Carpenter's work product was not satisfactory.  Specifically, tax documents contained "incomplete or inaccurate social security numbers and mistakes" which, in addition to other mistakes for which Carpenter was at least partially responsible, led Renfro to have problems with the IRS.  [*Id*.]  Based on the aforementioned and also Kidd's "mandate to make the company more efficient and profitable," she recommended that Carpenter also be discharged.  [*Id*. at 2-3.]

The above stated reasons for terminating the employment of the Plaintiffs are legitimate and nondiscriminatory.  *See Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 546 (6th Cir. 2008) ("Poor performance is a legitimate, nondiscriminatory reason for terminating a person's employment and, by articulating such a reason, [the defendant] met its initial burden under the *McDonnell Douglas/Burdine* framework.")  The burden shifts back to the Plaintiffs who must now show that these proffered reasons are nothing more than pretext for illegal discrimination.  *Allen,* 545 F.3d at 394.

**3**

To proceed to trial, the Plaintiffs must present facts sufficient for a jury to "reasonably reject" Renfro's explanation of why it fired them.  *Chen v. Dow Chem. Co.,* 580 F.3d 394, 400 (6th Cir. 2009) (*citing Mickey v. Zeidler Tool Die Co.,* 516 F.3d 516, 526 (6th Cir. 2009)).  Pretext may be shown "either directly by persuading [the trier of fact] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Manzer,* 29 F.3d at 1081 (quoting *Burdine,* 450 U.S. at 256)).  "To make a submissible case on the credibility of the employer's explanation, the plaintiff must show by a preponderance of the evidence either (1) the proffered reasons had no basis *in fact,* (2) that the proffered

10

reasons did not *actually* motivate [the plaintiff's] discharge, or (3) that they were *insufficient* to motivate discharge." *Id.* at 1084; *see also Vincent,* 514 F.3d at 497 (applying standard to gender discrimination). The aforementioned "three-part test need not be applied rigidly" because, "'[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard*, 698 F.3d at 285 (quoting *Chen,* 580 F.3d at 400 n. 4)). Showing the employer's explanation lacked a basis in fact requires the plaintiff to present "evidence that the proffered basis for the plaintiff's discharge never happened, i.e., that they are 'factually false.'" *Rutherford v. Britthaven, Inc.*, No. CIV.A. 09-51-GFVT, 2010 WL 2228359, at *7 (E.D. Ky. June 2, 2010) aff'd, 452 F. App'x 667 (6th Cir. 2011) (quoting *Manzer,* 29 F.3d at 1081).

The Plaintiffs need not, however, necessarily introduce evidence of discrimination to overcome summary judgment:

> …[J]udgment as a matter of law for the defendant in an employment-discrimination case may be appropriate under certain circumstances even if the plaintiff has made out a prima facie case of discrimination and has shown pretext. 530 U.S. 133, 148, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). In other circumstances, however, a prima facie case and a showing of pretext can support a jury verdict for the plaintiff. *Id.* at 147–48, 120 S.Ct. 2097. "[B]ecause a prima facie case and sufficient evidence to reject the employer's explanation may permit a finding of liability, [a court] err[s] in proceeding from the premise that a plaintiff must always introduce additional, independent evidence of discrimination." *Id.* at 149, 120 S.Ct. 2097. Applying the rationale of *Reeves* to the summary-judgment context, we have held that **"to survive summary judgment a plaintiff need only produce enough evidence to support a prima facie case and to rebut, but not to disprove, the defendant's proffered rationale."** *Blair,* 505 F.3d at 532.
>
> …Summary judgment for the defendant may be appropriate even after the plaintiff has presented evidence that the defendant's proffered reason for the termination was false "**if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision**, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue

11

and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves,* 530 U.S. at 148, 120 S.Ct. 2097. *Griffin v. Finkbeiner*, 689 F.3d 584, 593-594 (6th Cir. 2012). In the case at hand, the Plaintiffs argue that Renfro Valley's stated reasons for their terminations lack a basis in fact. The Court now considers each Plaintiff's arguments in turn.

Carpenter claims that Kidd's explanation for her termination "simply does not stand up to the evidence" because:

- At no time prior to the firing did defendant reprimand plaintiff for any unsatisfactory work;

- Defendant never undertook an evaluation of plaintiff's work;

- Defendant never spoke to plaintiff's supervisor regarding her work;

- Carpenter's supervisor was not aware of the firing beforehand;

- Had defendant consulted the plaintiff's direct supervisor, defendant would have learned that the plaintiffs work was far from unsatisfactory and was instead considered exemplary by her direct supervisor;

- Defendant has previously expressed a different reason for the firing, namely that there was a "lack of work".

[R. 35 at 8.] Even if the Court accepts all the above as true, Carpenter's claims still fail.

First, while Carpenter's performance was never formally reviewed [R. 35-7 at 46], it does not necessarily follow that Kidd's concerns with Carpenter's performance have no basis in fact. Kidd noted that whenever she had a question of Carpenter, it was as if Carpenter could not answer the question without the assistance of Tammy Clontz. [*Id*. at 30.] Kidd testified that the personnel manual Carpenter was responsible for was a "mess" and that files she kept were "not accurate." [*Id*.] From Kidd's perspective, Carpenter, Ramsey and Clontz "were more interested …in cooking and congregating than

12

doing what they were hired to do." [R. 35-7 at 29.] According to Kidd, the bottom line was that Carpenter "couldn't do the job." [R. 35-7.]

Second, Carpenter faults Kidd for never speaking to her supervisor, claims that her supervisor was unaware of the firing, and, finally, that had the supervisor been consulted Kidd would have learned that Carpenter's work was "exemplary." [R. 35 at 8.] The supervisor to which Carpenter refers is Tammy Clontz. To support this point, Carpenter has presented a letter of recommendation authored by Clontz.[2] If what is contained in Clontz's recommendation letter for Carpenter is an indication of what she would have reported to Kidd, then there can be no doubt that Kidd would have heard a glowing report. According to Clontz , Carpenter is "tenacious in completing her tasks," "always extremely efficient and vigilant," "accepted and excelled at new responsibilities and was recognized for her hard work through a long-overdue promotion to Director of Human Resources," and always went "above and beyond." [*Id*.]

Kidd did consult with Clontz about Carpenter's performance prior to promoting Carpenter to the Human Resources position [R. 35-7 at 17-18] but did not talk with Clontz about Carpenter's termination. [*Id*. at 18]. Based on Kidd's representations about the relationship between Clontz, Carpenter, and Ramsey, and the fact that Clontz was also terminated at the same time as both Carpenter and Ramsey, it is understandable that Kidd did not consult with her. The fact that Clontz thinks highly of Carpenter is of little significance. To let Clontz's opinions of Carpenter's work control would, in effect, put

---

[2] Initially, in support of their response to the motion for summary judgment, the Plaintiffs produced two letters from Clontz as exhibits. [R. 35-1; R. 35-3.] As originally submitted, neither of the letters were appropriate for the Court to consider as they were unsworn and unaccompanied by an affidavit. The Court provided the Plaintiffs an opportunity to cure this deficiency and they did. The letters were refiled with an accompanying affidavits from Clontz who swears the letters were written by her and accurately recount her recollections and opinions. *See* R. 41-1; 41-2.

Kidd's subordinate in the driver's seat. Also, it is worth noting that Clontz had earlier reported less glowingly that Carpenter's performance "was all right as long as someone was telling her what to do." [R. 35-7 at 29.]

Third, Carpenter notes that Kidd expressed a different reason for her termination, namely a "lack of work," in a form submitted to the division of unemployment. [*See* R. 35-2.] The Court need not speculate as to why Kidd would have provided the division of unemployment with this stated reason because, as recognized in *Griffin*, summary judgment may still be appropriate even where the plaintiff presents evidence that the employer's proffered reason for the termination was false. 689 F.3d at 594.

The Court also considers Carpenter's testimony about her own termination. When asked why she was terminated, she responded "I really don't know." [R. 34-4 at 44.] When more directly prodded on the point, Carpenter expressed her belief that it had to be due to age "[b]ecause I've never been reprimanded before…" and due to gender because "[t]his is just what I feel inside my heart. Ms. Kidd got along better with the male gender than she did the female gender." [R. 34-4 at 52-53.] Carpenter suggests that Kidd's tone and voice were different when talking to men and women in staff meetings. [*Id*.]

Ramsey presents an even weaker case. She argues that she did much more than just work on *The Bugle*, but that Kidd downplayed these other duties when she decided to terminate her. [R. 35 at 9.] In Ramsey's eyes, the only way to explain Kidd's focus is by assuming the termination was pretextual. This is simply incorrect. In addition to determining that *The Bugle* was "outdated, not cost-effective and would be discontinued after the December 2010 issue," Kidd also noted that Ramsey's other work product was

not of the "professional quality" that she expected. [R. 34-3 at 2.] She specifically cited to one instance around Thanksgiving time where Ramsey designed an advertisement that contained a turkey that looked as if it had been hand-drawn. [R. 35-7 at 71.] This was not the quality work that Kidd expected and, in the end, she did not believe that Ramsey was capable of producing the professional graphics they were seeking. [*Id*.]

Ramsey also presents a recommendation letter authored by Clontz, wherein it is reported that Ramsey's "articles [in *The Bugle*] were interesting and full of fun facts," that she "is as honest as the day is long," and that "her work ethic is above reproach." [R. 41-1.] None of these statements call Kidd's reasoning into doubt. *The Bugle* might have been interesting and fun but, according to Kidd, it was not profitable.

Ramsey's own testimony fails to help her case. When asked why she had been terminated, she responded, "I really don't know," and when pushed to provide more detail, she explained that she thought she was terminated from Renfro Valley due to her age and gender because a younger man replaced her. [R. 34-5 at 45.]

Finally, Ramsey also expresses concern that Kidd stated one of the reasons for the termination was to save Renfro money while, at the same time, Kidd was unaware of how much Ramsey was paid. [*Id*.] The Court does not understand why Kidd would have to know what Ramsey's salary was to know that Renfro would save money by severing ties with her. Unless one assumes that Ramsey was volunteering, her termination would save Renfro money.

No evidence has been presented that could lead a jury to reasonably find that the Plaintiffs' terminations were motivated by discrimination. The best evidence that Plaintiffs have to tie their terminations to age and gender is that both were replaced by

15

younger men. Even this argument is substantially weakened when one considers that Kidd is a female over the age of 40, that many of Carpenter's duties were given to Jackie Morris who is a female over the age of 40, and that the younger man who was hired to take over for Carpenter was subsequently terminated for "not doing his job" and was replaced by a female, Emily Bullock. [R. 35-6 at 5; R. 34-4 at 17; R. 35-7 at 51-52.]

Contrary to Plaintiffs' suspicions and allegations, the evidence shows that Kidd was brought to Renfro to "right the ship." As explained by the Plaintiffs, Kidd "had 90 days to make some changes," including "eliminat[ing] some things that would help save money" while also increasing accountability with the aim of making Renfro more profitable and efficient. [R. 34-4 at 30, 35-36; R. 34-5 at 5.] While the Plaintiffs might not agree with the decisions made by Renfro's management during this time of transition, it is not for the Court or a jury to second guess these business decisions absent some stronger showing that illegal discrimination occurred. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.")

In sum, the Plaintiffs have failed to show beyond a preponderance of the evidence that Renfro's stated reasons are untrue or lack a basis in fact. Quite to the contrary, Renfro has convinced this Court that the stated non-discriminatory reasons are the actual reasons the Plaintiffs were terminated. It is worth noting, however, that even if the Defendants were mistaken in how they assessed the Plaintiffs' performance or duties, "[w]hen an employer reasonably and honestly relies on particularized facts in making an employment decision, it is entitled to summary judgment on pretext even if its conclusion

16

is later shown to be 'mistaken, foolish, trivial, or baseless.'" *Chen*, 580 F.3d at 401 (*citing Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713-715 (6th Cir. 2007)).

### III

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** that the Defendant's Motion for Summary Judgment [R. 34] is **GRANTED**, the case will be **STRICKEN** from the record, and an appropriate judgment will be entered contemporaneously herewith.

This 2nd day of March, 2015.

Signed By:
*Gregory F. Van Tatenhove*
United States District Judge